# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Catherine A. Conley, an Individual,    :
                       Appellant    :
                                 :
             v.               :   No. 642 C.D. 2019
                                 :
County of Allegheny, a Second Class   :
County of the Commonwealth of      :
Pennsylvania                       :
                                 :
Catherine A. Conley, an Individual     :
                                 :
             v.               :   No. 695 C.D. 2019
                                 :   Argued: May 15, 2020
County of Allegheny, a Second Class   :
County of the Commonwealth of      :
Pennsylvania,                    :
                    Appellant    :


BEFORE:  HONORABLE P. KEVIN BROBSON, Judge
              HONORABLE ANNE E. COVEY, Judge
              HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge


*OPINION NOT REPORTED*


**MEMORANDUM OPINION**
**BY JUDGE BROBSON**           **FILED: July 28, 2020**


Before the Court are the cross-appeals of Catherine A. Conley (Owner)[1] and the County of Allegheny (County) from a decision of the Court of Common Pleas of Allegheny County (trial court), dated April 23, 2019. The trial court sustained the County's preliminary objections to Owner's Petition for Appointment of a Board

---

[1] Owner is an attorney representing herself *pro se*.

of Viewers (Petition). In addition, the trial court ordered the County to take certain remedial actions with respect to Owner's property. We have consolidated the parties' cross-appeals for purposes of analysis and disposition. We now affirm in part, reverse in part, and remand to the trial court for proceedings before a board of viewers.

## I. BACKGROUND

Owner owns the property at 327 Thompson Run Road in Ross Township, Allegheny County, Pennsylvania (the Property). The Property fronts on Thompson Run Road, a public road owned and maintained by the County. In August 2016, a County official informed Owner that the County would perform improvements to Thompson Run Road near the Property. In April 2017, the same official notified Owner that the County would remove three trees on the Property that were located within the right-of-way of Thompson Run Road on the basis that the trees were impeding sight along the road.

In late August 2017, employees of the County entered the Property and began a project to replace a manhole and underground stormwater pipes on the Property. The County did not notify Owner that it would be performing the stormwater facility maintenance. On August 29, 2017, Owner arrived home to find that County contractors had removed portions of her lawn, shrubbery, and subsurface invisible fencing. County contractors continued to enter the Property to work on the stormwater facility project through December 2017.

In October 2017, during the County's continuing work on the stormwater facility project on the Property, Owner filed an action in equity before the trial court. Specifically, Owner sought to enjoin the County from entering the Property for purposes of the tree removal project of which County employees had informed

2

Owner in April 2017. On October 25, 2017, following a hearing, the trial court denied Owner's request for a preliminary injunction. Soon thereafter, County contractors attempted to enter the Property for tree removal, claiming that the trial court's October 25, 2017 order permitted them to do so. Owner refused to allow them access to the Property, however, insisting that the trial court's order did not authorize entry and demanding that they survey and mark the boundary of the road right-of-way before proceeding. On January 8, 2018, pursuant to the County's motion, the trial court modified its October 25, 2017 order, affirmatively authorizing the County to enter the Property to mark the right-of-way boundary and remove the trees. Owner appealed the trial court's modification of its earlier order to this Court. Eventually, on May 16, 2018, the County entered the Property and completed the tree removal project, rendering Owner's appeal moot.[2]

On March 16, 2018, while her appeal of the trial court's January 8, 2018 order was still pending, Owner filed the Petition, alleging that the County had effected a *de facto* taking of the Property. (*See* Reproduced Record (R.R.) at 174a-85a.) In the Petition, Owner essentially asserted that the County had taken her property— without filing the proper declaration of taking—by (1) installing the stormwater facilities on the Property sometime in the past without recording an easement for those facilities, (2) entering the Property to replace the stormwater facilities and damaging Owner's property in the process, and (3) threatening to enter the Property, outside the road right-of-way, to remove the three trees. (*Id.* at 181a.) On June 19, 2018, the trial court issued an order appointing a board of viewers for the Property.

---

[2] By order dated July 27, 2018, we dismissed that appeal for Owner's failure to comply with our order directing her to file a brief in that matter. *See Conley v. Cty. of Allegheny* (Pa. Cmwlth., No. 175 C.D. 2018, filed July 27, 2018).

The County filed preliminary objections to the Petition and the resulting appointment of the board of viewers on July 10, 2018. The County contended that Owner failed to allege facts constituting a *de facto* taking and had, instead, alleged only a trespass. (*Id.* at 189a-91a.) Because the County raised factual issues in its preliminary objections, the parties engaged in discovery and various status conferences with the trial court. Ultimately, on April 11, 2019, the trial court held an evidentiary hearing on the Petition and the factual issues raised in the preliminary objections.

At the hearing, Owner first presented the testimony of Howard McIlvried, a surveyor retained by Owner. Mr. McIlvried explained that the stormwater facilities consist of three storm drain pipes connecting to a storm manhole. He then described how, based on a plan he prepared (which Owner introduced into evidence at the hearing), an easement sufficient to contain the renovated stormwater facilities on the Property would occupy roughly 3,030 square feet. (*Id.* at 29a.) On cross-examination, Mr. McIlvried admitted that he did not know the precise dimensions of the original stormwater facilities installed on the Property. (*Id.* at 35a-36a.)

Owner also testified at the hearing. She explained that, when she purchased the Property in 1997, neither her title insurance policy nor the survey of the Property indicated the presence of any stormwater facilities or easements. (*Id.* at 43a-44a.) Owner described how, despite receiving no confirmation of any particular start date from the County, she arrived home on August 29, 2017, to find bulldozers, workers, her hedges removed, and "a big hole in [her] yard." (*Id.* at 52a-53a.) Owner stated that until that point, she had been unaware that there were stormwater pipes on the Property. She explained that the stormwater facility project lasted from late August

4

to late October, during which time all of her hedges and lawn were turned into a "dirt area" and "construction materials [were] all over [her] yard." (*Id.* at 56a.) In December 2017, with the Property in the same general condition, County contractors working on the shoulder of Thompson Run Road dumped a large pile of soil on the Property, ignoring Owner's requests that they restore some of the Property first. (*Id.* at 57a-58a.) Owner further testified that, even after completing the later tree removal project in May 2018, the County never replaced her hedges or "fixed" her yard, and that she "can't use [the yard]" because of this. (*Id.* at 68a.) Her mailbox and the invisible fence were also destroyed and never replaced by the County. (*Id.* at 69a, 71a.)

Owner explained that, up to the date of her testimony, her front yard remained cluttered with pieces of asphalt and other construction debris, unsightly, embarrassing, and essentially unusable. When Owner endeavored to replace the mailbox that was destroyed during the County's work, she did not know where or how deeply she could excavate without interfering with the stormwater facilities. (*Id.* at 69a.) She claimed she cannot plant new trees in a large portion of her front yard because of the facilities.

On cross-examination, Owner admitted that she became aware of a manhole in her yard in 1998, shortly after purchasing the Property. (*Id.* at 74a.) To her recollection, the manhole was smaller than the replacement installed by the County in 2017. In 1998, Owner believed the manhole to be related to underground telephone lines and made no further investigation because no underground facilities were shown on her title report or survey. (*Id.*) Owner stated that she suffered only minor inconvenience due to the manhole while mowing the lawn, and she did not then perceive any greater interference with her use of the property because she did

5

not know the extent of the underground facilities. (*Id.* at 75a.) Owner conceded that, although she has lost the use of her front yard and can no longer entertain guests, the work performed by the County has not rendered her home uninhabitable, and she still resides there. (*Id.* at 78a-84a.) She testified that she is interested in selling her home and believes she cannot do so without an easement of record for the stormwater facilities.

The County presented the testimony of Jeanna Fisher, who is employed by the County as a project manager. Ms. Fisher supervised the Thompson Run Road improvement project. She explained that Thompson Run Road was first laid out in the early 20th century through farmland, a portion of which was later subdivided to create the Property. (*Id.* at 94a-99a.) She described the history and function of the stormwater facilities on and around the Property. (*Id.* at 99a-114a.) Ms. Fisher further testified that, at Owner's request, she and other County officials met with Owner at the Property in July 2017 to discuss the County's plans for removing the three trees on the Property. (*Id.* at 116a.) At that meeting, the officials offered to plant new trees on the Property further back from the road. They also informed Owner that they intended to replace the manhole and one of the existing stormwater pipes on the Property. (*Id.* at 117a.) When Owner complained at the meeting that the Property often has stormwater management problems after significant rainfall, County officials offered to install a new stormwater inlet to alleviate those problems. (*Id.* at 118a.) Owner refused this offer because it would require removal of one of the trees Owner did not wish to have removed. (*Id.* at 119a.)

On cross-examination, Ms. Fisher stated that she and the County's engineer "guessed" that the stormwater facilities were located in an L-shaped area on the Property. (*Id.* at 126a.) They did so based on observing the direction of the pipes

from inside the manhole, because no easement was ever formally granted by prior owners or recorded showing the location of the facilities. (*Id.* at 127a-28a.) The County did not pursue recording an easement for the facilities when it replaced one of the pipes in the 1980s because the facilities had already been in place for many decades at that point. (*Id.* at 131a.)

Finally, the County presented the testimony of Michael Dillon, who served as Deputy Director of Public Works for the County at the time of the relevant events. Mr. Dillon stated that, at the late-July meeting, Owner refused to accept the County's offer of replacement trees and installation of an additional stormwater inlet to reduce flooding. He added, however, that he recalled that meeting occurring after the County began work on the Property—not before. (*Id.* at 165a.) Mr. Dillon also stated that the private contractor conducting the work on the Property remains obligated under contract to restore the Property as closely as possible to its previous condition. (*Id.* at 159a-60a.) Mr. Dillon testified that Owner has refused entry to the contractor—including by contacting police—on a number of occasions, thus preventing restoration of the Property. (*Id.* at 160a.) Mr. Dillon opined that replacement of the manhole in 2017 did not enlarge the effect of the stormwater facilities on the use of the Property. (*Id.* at 163a.) On cross-examination, Mr. Dillon admitted that he had no personal knowledge of whether Owner had contacted the police to prevent the County contractor from restoring the Property. He also confirmed that the Property remains unrestored. (*Id.* at. 167a-68a.)

Following the hearing, the trial court issued the order that is the subject of this appeal. In sustaining the County's preliminary objections, the trial court reasoned that, because the stormwater facilities had been in place on the Property for so long, the County was authorized to enter the Property and replace the facilities pursuant

to Section 2905 of the Second Class County Code, Act of July 28, 1953, P.L. 723, *as amended*, 16 P.S. § 5905, commonly known as the Drains and Ditches Act. Additionally, the trial court noted that the County had authority to remove the trees from the road right-of-way. The trial court also observed that the replacement manhole, while perhaps slightly larger than the original, did not expand the "ground taken" for maintenance of the stormwater facilities. (Owner's Br., App. at 4.) The trial court later expressly concluded that "there was no taking of any property." (*Id*. at 5.)

Additionally, the trial court opined that "a written and recorded easement is warranted" and that the damage done to the Property during the stormwater facility replacement could be corrected by repairing Owner's landscaping. (*Id*.) Accordingly, in addition to sustaining the County's preliminary objections, the trial court ordered the County to: (1) restore Owner's landscaping, (2) install an additional stormwater inlet to reduce flooding on the Property, (3) plant three mature trees of Owner's choice on the Property, and (4) prepare a written easement agreement for the area of the Property occupied by the stormwater facilities. (*Id.* at 6-7.)

## II. ISSUES

On appeal,[3] Owner argues that the trial court erred in concluding that no taking of the Property occurred. Specifically, Owner argues that the County appropriated her property in three distinct ways—the initial installation of the stormwater facilities, entering the Property to replace those facilities in 2017, and use of the

---

[3] In eminent domain matters, our scope of review is limited to determining whether the trial court committed an error of law or abused its discretion. *Lang v. Dep't of Transp.*, 135 A.3d 225, 228 n.8 (Pa. Cmwlth.), *appeal denied*, 145 A.3d 729 (Pa. 2016).

8

Property for two days to complete the tree removal project.[4] We address each of these bases or theories for Owner's *de facto* takings claim below.

In its cross-appeal, the County claims that the trial court abused its discretion in ordering the County to take the four specific remedial actions listed in the order. In support, the County argues that, pursuant to the Eminent Domain Code (Code),[5] the trial court had authority only to determine whether a taking had occurred and, once it found no taking, was without jurisdiction to order further relief. The County also argues that Owner, in the Petition, did not request any of the relief granted.

## III. DISCUSSION

Pursuant to Section 502(c)(1) of the Code, a landowner may seek compensation for a taking of property by asserting "that the owner's property interest has been condemned without the filing of a declaration of taking." 26 Pa. C.S. § 502(c)(1). This type of taking is known as a *de facto* taking and is distinct from a *de jure* taking, in which the appropriating entity files a declaration of taking. *See In re Crosstown Expressway*, 281 A.2d 909, 910 n.1 (Pa. Cmwlth. 1971) (en banc). "A *de facto* taking . . . occurs when an entity with eminent domain powers substantially deprives property owners of the use and enjoyment of their property." *In re Borough of Blakely*, 25 A.3d 458, 464-65 (Pa. Cmwlth. 2011), *appeal denied*, 37 A.3d 1197 (Pa. 2012). Concerning proof of a *de facto* taking, we have held:

> There is a heavy burden of proof in *de facto* taking cases. Specifically, the owner must allege and prove the following:  1) condemnor has the power to condemn the land under eminent domain procedures; 2) exceptional

---

[4] In her brief on appeal, Owner also identifies the persistent flooding of her driveway as a *de facto* taking by the County. In the Petition, however, Owner described only three bases for her *de facto* takings claim (as enumerated above) and made no mention of the flooding issue. (*See* R.R. at 181a.) Accordingly, that issue is not before us on appeal.

[5] 26 Pa. C.S. §§ 101-1106.

circumstances have substantially deprived the owner of the use and enjoyment of the property; and 3) the damages sustained were the immediate, necessary, and unavoidable consequences of the exercise of the power of eminent domain.

*Griffith v. Millcreek Twp.*, 215 A.3d 72, 75 (Pa. Cmwlth. 2019) (citation omitted), *appeal denied*, 223 A.3d 660 (Pa. 2020). "Preliminary objections are the exclusive method under the Code of raising legal and factual objections to a petition for appointment of viewers that alleges a *de facto* taking, and the petition may not be dismissed by the trial court without first conducting an evidentiary hearing to determine whether a *de facto* taking has occurred." *Linde Enters., Inc. v. Lackawanna River Basin Sewer Auth.*, 911 A.2d 658, 662 (Pa. Cmwlth. 2006).

*De facto* takings need not—and usually do not—involve actual, physical taking of property. Takings without a direct physical intrusion, but in which an entity essentially confiscates property through the exercise of its regulatory or police powers, are often known as "regulatory takings." *See Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005); *Machipongo Land & Coal Co. v. Cmwlth.*, 799 A.2d 751, 762 (Pa. 2002) (discussing "regulatory taking cases that do not involve a physical invasion of private property"). Accordingly, Pennsylvania courts have held that a physical intrusion into private property is not a *necessary* condition for a *de facto* takings claim. *See In re Sansom St. in City of Phila.*, 143 A. 134, 136 (Pa. 1928) (holding that "[t]here *need* not be an actual, physical taking" to require compensation for a *de facto* taking); *Dep't of Transp. v. Greenfield Twp.—Prop. Owners*, 582 A.2d 41, 44 (Pa. Cmwlth. 1990) ("[W]hen . . . *even* a non-appropriative act . . . substantially deprive[s] an owner of . . . his property, a *de facto* taking will be deemed to have occurred."), *appeal denied*, 593 a.2d 844 (Pa. 1991); *Petition of Borough of Boyertown*, 466 A.2d 239, 245 (Pa. Cmwlth. 1983) ("[P]hysical

appropriation . . . [is not] *required* to create a right to eminent domain damages.")) A taking can, however, be both physical (*i.e.*, not regulatory) and *de facto* (*i.e.*, not *de jure*).[6]

"[I]rrespective of the police powers rubric, a physical invasion and permanent occupation of private property . . . is a taking." *In re Opening Private Rd. for Benefit of O'Reilly*, 5 A.3d 246, 257 (Pa. 2010) (*O'Reilly*) (citing *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 421 (1982) ("[A] physical occupation of property is a taking.")). This is true regardless of the size or effect of the permanent, physical occupation. *Mock v. Dep't of Envtl. Res.*, 623 A.2d 940, 948 (Pa. Cmwlth. 1993), *aff'd*, 667 A.2d 212 (Pa. 1995) (en banc); *see also Machipongo Land & Coal Co.*, 799 A.2d at 763 ("If a regulation authorizes a physical invasion of private property, no matter how slight, the U.S. Supreme Court has consistently concluded that a taking has occurred.").

## A. *De Facto* Takings Claim

### 1. Initial Installation of Stormwater Facilities

Owner first claims the County took her property by installing the stormwater facilities in the first instance, thereby physically occupying and appropriating a portion of the Property. She argues that the trial court, therefore, erred in failing to conclude that a taking occurred. The County emphasizes that the initial installation of the stormwater facilities occurred nearly 100 years ago and was authorized by

---

[6] We have stated this proposition differently in observing that "[a] *de facto* taking is not the physical seizure of property." *Adams Outdoor Advert., LP v. Zoning Hearing Bd. of Smithfield Twp.*, 909 A.2d 469, 480 (Pa. Cmwlth. 2006) (quoting *Visco v. Dep't of Transp.*, 498 A.2d 984, 985 (Pa. Cmwlth. 1985)), *appeal denied*, 923 A.2d 1175 (Pa. 2007). Neither *Adams* nor *Visco* involved a physical appropriation, and neither case can be construed as holding that a physical appropriation precludes a *de facto* takings claim. Rather, we simply acknowledged the well-established rule that a *de facto* taking is not *necessarily* (and, indeed, is not usually) the physical seizure of property.

11

statute at the time. The County argues that any claim of a taking occurring prior to the 2017 work is barred by the statute of limitations.

The chief disagreement between the parties on this takings theory is whether the statute of limitations bars Owner's claim. Owner argued before the trial court— and the trial court acknowledged—that the County waived the statute of limitations defense by failing to raise it in the preliminary objections to the Petition. (*See* R.R. at 96a.) Owner reiterates this argument on appeal. In response, the County first claims that it was unaware of the statute of limitations issue when it filed the preliminary objections because the Petition did not specifically allege any taking before 2017. The County also claims that, despite its failure to preserve the issue in the preliminary objections, the County preserved the issue in its later motion *in limine* before the trial court.

It is the settled law of *de facto* condemnation proceedings that the condemnor's failure to raise the statute of limitations as a defense in its preliminary objections waives that defense. *In re Mountaintop Area Joint Sanitary Auth.*, 166 A.3d 553, 564 (Pa. Cmwlth. 2017). Raising the defense later in the proceedings (as in the County's motion *in limine*) does not cure the waiver. *Id.* Here, the County acknowledges that it did not raise the statute of limitations defense in its preliminary objections. (*See* County's Br. at 25 n.10.) The County could have raised the statute of limitations argument in its preliminary objections because, contrary to the County's assertion, the Petition clearly and repeatedly articulates "installation" and "later replacement" of the stormwater facilities as two distinct bases for the takings claim. (R.R. at 180a-81a.) We, therefore, agree with Owner and the trial court that the County has waived the defense of the statute of limitations.

12

Turning to the merits, it is undisputed that the stormwater facilities at issue were permanently installed by the County or its agents on the Property. The County admits that it has the power of eminent domain pursuant to Pennsylvania law. (R.R. at 231a.) Thus, the initial installation of the stormwater facilities on the Property represented a physical appropriation of a portion of the Property by an entity with eminent domain power—*i.e.*, a taking—for which just compensation was required. Pa. Const. art. I, § 10 ("[N]or shall private property be taken or applied to public use, without authority of law and without just compensation being first made or secured."); *O'Reilly*, 5 A.3d at 257 n.2.

The existence of the taking on this theory does not depend, as the County asserts, on whether the Property was rendered entirely valueless or uninhabitable, because any physical appropriation—no matter how slight—is a taking. *See Mock*, 623 A.2d at 948. The County cites a line of cases where owners alleged *de facto* takings of their *entire* properties based on threatened *de jure* takings of a portion thereof. In those cases, we uniformly held that a threatened partial taking of a residential lot does not render the *entire* property valueless, as the owners claimed, because the remainder of the property is usable for residential purposes. *See Dep't of Transp. v. Steppler*, 542 A.2d 175, 178 (Pa. Cmwlth. 1988) (en banc); *Dep't of Transp. v. Kemp*, 515 A.2d 68, 73 (Pa. Cmwlth. 1986), *aff'd*, 535 A.2d 1051 (Pa. 1988); *Dep't of Transp. v. Smoluk*, 514 A.2d 1000, 1002 (Pa. Cmwlth. 1986), *aff'd*, 535 A.2d 1051 (Pa. 1988).[7] Those cases are inapposite here, however, because Owner does not claim a total taking, so her residential use of a portion of the Property

---

[7] The Pennsylvania Supreme Court affirmed our decisions in *Kemp* and *Smoluk* in a single per curiam order.

is irrelevant.[8] Although the stormwater facilities do not prevent use of the Property in general as a residence, they permanently prevent Owner from using the portions of the Property they physically occupy. Accordingly, the trial court erred in concluding that no taking occurred when the County initially installed the stormwater facilities on the Property.[9]

Because we conclude that a *de facto* taking occurred, we will remand this matter to the trial court for proceedings before a board of viewers. Before reaching that stage of the proceedings, however, the trial court itself must determine, on remand, "the condemnation date and *the extent and nature* of any property interest condemned." 26 Pa. C.S. § 502(c)(2) (emphasis added); *Szabo v. Dep't of Transp.*, 202 A.3d 52, 64 (Pa. 2019) (remanding "so that the trial court can . . . determine the property interests affected by the taking, and the board of viewers can determine the

---

[8] The County also cites an unreported decision of this Court in which we stated: "[I]f the owner can still use his property as a residence . . . , there is no substantial deprivation of the property's highest and best use, and, thus[,] no *de facto* taking." *In re LeFever* (Pa. Cmwlth., No. 1251 C.D. 2016, filed May 31, 2017), slip op. at 6. First, we note that *LeFever*, as an unreported decision, is not binding precedent. *See* 210 Pa. Code § 69.414(a). Second, the owner in *LeFever*, like the owners in the other cases on which the County relies, claimed a taking of the *entire* residential property. Accordingly, *LeFever*, like our earlier line of cases, stands for the proposition that continued use of a residential property as a residence means that no *de facto* taking *of the entire property* has occurred.

[9] The County also suggests that Owner should fail on her initial installation theory because she did not prove that predecessors in title were never compensated for the alleged taking. It is not clear what the County is suggesting by this assertion. If the County believes a declaration of taking was filed previously, it should have objected to Owner's choice to proceed under Section 502(c) of the Code, which applies only in the absence of a declaration of taking. If the County believes compensation was previously paid without a formal taking, it was incumbent on the County to raise that issue, and Section 502(c) certainly does not require landowners to investigate the prospect of prior, undocumented payments without any suspicion that they occurred. In any case, the County should have raised the issue of prior compensation in its preliminary objections, which it did not do. This objection is, therefore, waived. *In re Mountaintop*, 166 A.3d at 564.

14

proper compensation for that property"). The extent of the taking that occurred is a factual matter for the trial court, because "a board of viewers' jurisdiction is statutorily limited to assessing the value of a defined property interest that has been taken, and does not extend to fact[]finding regarding the . . . extent of the taking itself." *Szabo*, 202 A.3d at 66 (Wecht, J., concurring).

In determining the extent of the taking, we note that the power to condemn is a grant of power to acquire *only* that interest in real estate that is "necessary to carry out the public purposes" of the condemnation, and no more. *Cmwlth. v. Renick*, 342 A.2d 824, 827 (Pa. Cmwlth. 1975) (en banc). The public purpose here is the continued function of the stormwater facilities for stormwater management. The property interest the County necessarily appropriated for that purpose consists of essentially two parts: (1) a permanent easement allowing the facilities to occupy portions of the Property and to remain undisturbed by Owner's use[10] (the permanent easement), and (2) the ongoing right to enter and/or disturb additional portions of the Property, but only to the extent necessary for access to and continued maintenance, repair, and replacement of the facilities (the maintenance easement). The permanent easement is worthless without the maintenance easement, and vice versa, so both are necessary for the public purpose of the taking. The trial court must determine the physical extent and effective date of both easements on remand before the board of viewers can determine the compensation due for those easement interests.

---

[10] To the extent that the County's replacement of the manhole enlarged the dimensions of the stormwater facilities, the extent of the permanent easement would increase accordingly as of the date of the replacement for purposes of compensation.

15

## 2. Replacement of Stormwater Facilities

Owner alleges that a second *de facto* taking occurred when County contractors entered her Property to replace the existing stormwater facilities. Owner argues that the County's entry onto and destruction of her front yard and landscaping substantially deprived her of the use of that portion of the Property. In response, the County argues that Owner, rather than pleading the elements of a *de facto* taking, has essentially pled a claim for trespass and/or negligence. The County points out that Owner continues to occupy the residence on the Property and that the damage is repairable. It argues, therefore, that no substantial deprivation has occurred. Additionally, the County asserts that no taking occurred because it has statutory authority to enter the Property and replace the facilities pursuant to the Drains and Ditches Act.

We first address the County's counterargument based on the Drains and Ditches Act. We agree with Owner that the County failed to raise this alleged source of authority in the preliminary objections. As we have stated many times, "[p]reliminary objections are the *exclusive* method under the Code of raising *legal* and factual objections to a petition for appointment of viewers that alleges a *de facto* taking." *Linde Enters., Inc.,* 911 A.2d at 662 (emphasis added); *accord In re Mountaintop*, 166 A.3d at 564; *Genter v. Blair Cty. Convention & Sports Facilities Auth.*, 805 A.2d 51 (Pa. Cmwlth. 2002), *appeal denied*, 825 A.2d 1263 (Pa. 2003); *McGaffic v. Redevelopment Auth. of City of New Castle*, 732 A.2d 663 (Pa. Cmwlth.), *appeal denied*, 747 A.2d 903 (Pa. 1999); *Lehigh-Northampton Airport Auth. v. WBF Assocs., L.P.*, 728 A.2d 981 (Pa. Cmwlth.), *appeal denied*, 747 A.2d 372 (Pa. 1999). The only exception to this general rule is that supplementary objections may be filed, but only if the landowner files an amended

petition. *Skokut v. MCI*, 613 A.2d 55, 58 (Pa. Cmwlth. 1992). The County's argument based on the Drains and Ditches Act purports to present a legal challenge to the Petition, but the County did not raise the challenge in the preliminary objections. It is, therefore, waived.[11]

To the extent that Owner's facility replacement theory supports a takings claim, it can do so only with respect to that portion of the Property not already appropriated by the initial installation of the stormwater facilities (or the permanent expansion thereof). Owner has, however, alleged entry onto and deprivation of her entire front yard by the County, and it is clear from the record that the extent of the disruption to the Property caused by the facility replacement is not limited to the immediate area occupied by the facilities. Here though, unlike the facilities themselves, the intrusion onto the Property is only temporary.

It appears that Pennsylvania courts have not yet addressed whether a *temporary* physical appropriation of private property by the government is necessarily a taking.[12] On one hand, where an entity with eminent domain power acquires a temporary construction easement in private property, it typically does so by filing a declaration of taking. *See, e.g.*, *In re Dep't of Transp.*, 137 A.3d 666, 667

---

[11] Additionally, we note that the right to compensation for a taking "inheres in the *constitutional* prohibition that no one shall be deprived of property for public use without receiving just compensation therefor." *Petition of H. C. Frick Coke Co.*, 42 A.2d 532, 534 (Pa. 1945) (emphasis added). Although "the legislature may prescribe . . . the procedure for the enforcement of such claims and the periods in which actions therefor must be brought," statutes—such as the Drains and Ditches Act—cannot displace the constitutional right to compensation. *Id.*

[12] The U.S. Supreme Court has addressed this issue in the context of federal takings law, noting that "the Court has recognized few invariable rules in this area." *Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23, 31 (2012) (ultimately finding taking by United States for repeated, temporary flooding). The Court reiterated the "bright line[]" rule that "a permanent physical occupation of property authorized by government is a taking" but distinguished temporary physical takings as "turn[ing] on situation-specific factual inquiries." *Id.* at 31-32.

(Pa. Cmwlth. 2016); *Luzerne Cty. Flood Prot. Auth. v. Reilly*, 825 A.2d 779, 780 (Pa. Cmwlth. 2003); *In re Condemnation by Dep't of Transp. of Right of Way, for Legislative Route 67045, Section 108 R/W*, 455 A.2d 229, 230 (Pa. Cmwlth. 1983). This suggests that physical appropriation of private property for public construction can be accomplished only through the eminent domain power and is, therefore, a *de facto* taking if accomplished without a declaration of taking.

On the other hand, in the context of regulatory takings, our courts are less likely to find a taking if the deprivation is only temporary. It is well established that a landowner may seek compensation for a temporary regulatory taking, but only after it has exhausted remedies that would invalidate or otherwise offer relief from the offending regulation; otherwise, we have held, the takings claim is not ripe. *Tobin v. Ctr. Twp.*, 954 A.2d 741, 748 (Pa. Cmwlth. 2008), *appeal denied*, 967 A.2d 962 (Pa. 2009). Moreover, our Supreme Court has held that a *partial* temporary regulatory taking (*i.e.*, one that denies a landowner only some, but not all, beneficial use of property for a time) is different in kind from a *total* temporary regulatory taking and may not require just compensation. *Miller & Son Paving, Inc. v. Plumstead Twp., Bucks Cty.*, 717 A.2d 483, 486 (Pa. 1998). Because the law of eminent domain in this area remains relatively undeveloped, we think it is particularly important to rely on the standards for *de facto* takings that are clearly established, as articulated in *Griffith* and earlier cases. Those standards incorporate the "situation-specific factual inquiries" on which temporary physical takings analysis should turn. *Arkansas Game & Fish Comm'n,* 568 U.S. at 32.

Applying those standards, we conclude that the Owner has not shown a *de facto* taking on the facility replacement theory. As we have discussed, the County has condemned, through its *de facto* taking, a maintenance easement allowing access

18

to portions of the Property necessary to repair and replace the stormwater facilities. Any physical occupation within that easement area with regard to the work performed on the stormwater facilities, therefore, is not an additional taking. To the extent that the County may have entered onto the Property beyond the easement area, in order to constitute a taking, Owner would have to demonstrate that the entry onto and destruction of her yard was a "necessary . . . and unavoidable consequence[]" of the County's restoration project. *Griffith*, 215 A.3d at 75. The area of the maintenance easement (as it will be defined by the trial court) theoretically should encompass any area "necessary" for the restoration project, thus resulting in no entry onto or disruption of the Property outside the maintenance easement. In theory, it is possible that the County entered onto and temporarily disrupted areas of her yard that it did not need to enter or disrupt to perform its work—*i.e.*, areas that were not within the maintenance easement—but Owner did not advance that argument. Moreover, the consequences of the County's actions (outside the permanent placement of the stormwater facilities) are avoidable, because the County's presence on the Property has actually ceased and the remaining damage to the landscaping can be repaired. The trial court followed a similar analysis in observing at the hearing that, rather than a taking, the damage to the Property may be "negligence on the County's part in not restoring the property the way it should look afterwards." (R.R. at 134a.) In other words, based on the allegations in the Petition and the evidence of record, it is not clear that the physical extent and duration of the disruption to the Property was an indispensable part of the County's work on the Property. Because of this, Owner failed to prove that a *de facto* taking occurred.

Another implication of the reversible, temporary nature of the deprivation here is that it essentially renders Owner's takings claim unripe for disposition.

Under the well-developed law of regulatory takings, Owner would need to exhaust other remedies for that deprivation before bringing a takings claim. *Tobin*, 954 A.2d at 748. Here, first and foremost, the County represented to the trial court that it was and is willing to restore Owner's yard (either through its contractor or with its own personnel). Indeed, it appears that Owner herself has prevented those restoration efforts by refusing access to the Property and pursuing this takings claim instead. Even if the County were not willing to restore the Property, Owner could pursue another equitable action against the County to compel restoration, or she could seek damages through an action in trespass. For the foregoing reasons, the trial court correctly concluded that the County's entry onto and damage to the Property during the replacement project was not a *de facto* taking.

### 3. Tree Removal

Lastly, Owner asserts that the County's use of a portion of the Property outside the road right-of-way during the tree removal project constituted a two-day-long *de facto* taking of that portion of the Property. The trial court did not specifically address this theory, perhaps due to the County's continued insistence that Owner should not be permitted to relitigate the propriety of removing the trees, which was the subject of the equity action before the trial court. As Owner explains, however, the issue in the equity action—whether the County had authority to remove the trees at all—is distinct from the County's temporary use of the Property (outside the right-of-way) to remove the trees.

Here, we also conclude that Owner has failed to meet the high burden of proving a *de facto* taking. Unlike the front yard damage—where Owner testified to specific, concrete deprivations, such as inability to walk on her front lawn or entertain guests—Owner has asserted no specific, nonspeculative deprivations

20

resulting from the two-day tree removal project. Instead, she generally stated that she suffered "a lack of privacy" during those days, without providing any detail. (R.R. at 9a.) Speculative or conjectural allegations of deprivation are not sufficient to support a *de facto* takings claim. *Borough of Blakely*, 25 A.3d at 467. The record contains no other, more concrete evidence or assertion of how or to what extent the County physically occupied or otherwise deprived Owner of the use of the Property during the tree removal project. The nonspecific and speculative nature of the asserted deprivation is fatal to Owner's claim on this theory. The trial court did not, therefore, err in concluding that Owner showed no taking with respect to the tree removal project.

## B. Equitable Relief

Finally, we address the County's cross-appeal. The statutory basis of Owner's claim is Section 502(c) of the Code, which authorized the trial court to determine only "whether a condemnation has occurred," and to proceed beyond that inquiry only "*if* the court determines that a condemnation has occurred." 26 Pa. C.S. § 502(c)(2) (emphasis added). We agree with the County that the trial court abused its discretion in essentially ordering equitable relief—which, we note, was not requested in the Petition—after finding that no taking had occurred. Accordingly, we will reverse that portion of the trial court's order.

Because we will remand this matter for proceedings before a board of viewers, we direct the trial court, on remand, to enter an appropriate order concerning the property taken, as required by the Code. *See* 26 Pa. C.S. § 502(c)(3)-(4) ("The court shall enter an order specifying any property interest which has been condemned . . . . A copy of the order . . . shall be filed by the condemnor in the office of the recorder

21

of deeds . . . ."). That order, once recorded, will satisfy both Owner's and the County's desires for a recorded instrument reflecting the extent of the taking.

## IV. CONCLUSION

For the foregoing reasons, the trial court erred in concluding that no *de facto* taking occurred with respect to the initial installation (and/or later enlargement) of the stormwater facilities on the Property to the extent that such facilities permanently, physically occupy any portion of the Property and require future use of portions of the Property for maintenance, repair, or replacement. Accordingly, we will reverse the trial court's order sustaining the County's preliminary objections with respect to that single basis of Owner's takings claim and remand this matter to the trial court for further proceedings consistent with this opinion.

With respect to the other two bases of Owner's claim (temporary use of the Property for purposes of the facility replacement and tree removal projects), the trial court did not err in concluding that no taking occurred. We will, therefore, affirm the trial court's order sustaining the County's preliminary objections with respect to those theories. Finally, we will reverse the portion of the trial court's order granting relief to Owner.

P. KEVIN BROBSON, Judge

22

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Catherine A. Conley, an Individual,     :
               Appellant     :
       :
        v.     :    No. 642 C.D. 2019
       :
County of Allegheny, a Second Class     :
County of the Commonwealth of     :
Pennsylvania     :
       :
Catherine A. Conley, an Individual     :
       :
        v.     :    No. 695 C.D. 2019
       :
County of Allegheny, a Second Class     :
County of the Commonwealth of     :
Pennsylvania,     :
               Appellant     :

# **O R D E R**

AND NOW, this 28th day of July, 2020, the order of the Court of Common Pleas of Allegheny County is hereby AFFIRMED in part and REVERSED in part in accordance with the accompanying opinion. Further, this matter is REMANDED to the trial court for proceedings before a board of viewers.

Jurisdiction relinquished.

_____
P. KEVIN BROBSON, Judge